UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUANA CONLEY, <br> Plaintiff, <br> v. <br> NANCY A. BERRYHILL, <br> Defendant. | Case No.13-cv-04807-JSC <br><br> **ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT** <br><br> Re: Dkt. Nos. 32, 38 |

In this Social Security appeal, Plaintiff Luana Conley seeks waiver of a $44,250.80 repayment of disability insurance benefits improperly made to her over a two-year period. Defendant Commissioner of the Social Security Administration ("Commissioner") found Plaintiff at fault for the overpayment and denied her request for waiver. The parties' cross-motions for summary judgment are now pending before the Court. (Dkt. Nos. 32 & 33.) Because the Administrative Law Judge's decision is supported by substantial evidence, the Court GRANTS the Commissioner's motion for summary judgment and DENIES Plaintiff's cross-motion for summary judgment.[1]

---

[1] Both parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (Dkt. Nos. 18 & 22.)

# FACTUAL & PROCEDURAL BACKGROUND

## A. Plaintiff's Disability Benefits

Luana Conley applied for disability insurance benefits on September 30, 1996. (Administrative Record ("AR") 12.) She was found to be disabled based on impairments of bipolar disorder, possible carpal tunnel syndrome, and cervical pain with an onset date of March 25, 1997. (*Id.*) Plaintiff thereafter worked for several employers such as Salinas Newspapers, In-Home Supportive Services, and for California State University Monterey Bay. (*Id.*)

On December 22, 2006, Plaintiff sent a letter to the Social Security Agency ("SSA") sending documentation showing that she had a new job with California State University Monterey Bay and stating that she was in her trial work period since she began to earn over $800 per month as of May 2006.[2] (AR 270.) Plaintiff's letter concluded "I expect an adjustment to my current monthly disability benefit and would like information on the continuation of my Medicare health coverage." (*Id.*) Plaintiff's disability benefits nonetheless continued until July 3, 2008, when the SSA notified Plaintiff that based on earnings information, she was no longer eligible for disability benefits. (AR 35.) In that letter, SSA stated that Plaintiff was not entitled to the benefits she had received from April 2006 forward because she began performing substantial gainful work in October 2005. (*Id.*) SSA concluded that Plaintiff's nine months of trial work period expired in September 2005 based on the following months during which Plaintiff earned more than the allowable trial work period monthly earnings: June 2003, July 2003, March 2005, April 2005, June 2005, July 2005, August 2005, and September 2005. (AR 37.)

Plaintiff responded to SSA's letter and objected to the calculation of her trial work period. (AR 39.) She insisted that her trial work period did not start until April 17, 2006 because her earnings prior to that date were not substantial. (*Id.*) Plaintiff maintained that she had been advised by a counselor at the Monterey Disability office that her social security disability would not be affected unless her monthly income exceeded $800 which it did not until April 2006. (*Id.*) Plaintiff stated that the correct ending date for her trial work period was December 2006. (AR

---

[2] As noted below, this letter was provided by Plaintiff and was not part of Plaintiff's social security file.

39.)

Plaintiff was thereafter assessed an overpayment in the amount of $44,250.80 for which she sought a waiver on May 7, 2009. (AR 47.) In her waiver application, Plaintiff noted that she had advised SSA that she was employed back in August 2005, but that no one had returned her calls. (AR 48.) She stated that she no longer had the overpaid funds and she could not afford to pay it back. (AR 49.) Plaintiff requested a personal conference to discuss her waiver request and had one on July 24, 2009. (AR 72.) At the conference, she advised the SSA representative that there was an error in calculating her trial work period and requested the opportunity to present additional evidence to show that it ended at a later date. (*Id*.) She was granted two weeks to do so, but failed to submit any additional evidence. (*Id*.) SSA thereafter issued a waiver determination concluding that the amount of overpayment was $44,250.80 and that Plaintiff was not entitled to a waiver because she knowingly accepted the incorrect payments which were sent to her. (AR 72-73.) SSA was not persuaded by Plaintiff's claim that she had sent letters asking for the payments to be stopped because there were no such letters in the file, nor her argument that she could not reject the payments since they were sent directly to her bank and not as checks. (AR 73.) Instead, SSA noted that Plaintiff admitted she received pamphlets explaining the trial work period and that although she was given extra time to submit evidence contesting the trial work period determination, she failed to submit anything. (*Id*.) Under the circumstances, SSA held that she could not be found without fault in the overpayment. (*Id*.)

A month later, SSA sent Plaintiff a letter stating that she no longer qualified for disability benefits as of October 2008. (AR 221.) Plaintiff then requested a hearing before an ALJ. (AR 78.) A year later, on September 15, 2010, Plaintiff had her first hearing before Administrative Law Judge ("ALJ") Regina Sleater. (AR 358-406.) The hearing was continued to allow Plaintiff to obtain and present additional evidence. Plaintiff's second hearing occurred on July 14, 2011. (AR 293-351.) Plaintiff was represented by the same counsel as here, David Brown, at both of these hearings.

//
//

3

## B. The ALJ Hearing

### 1) Plaintiff's First ALJ Hearing

Plaintiff submitted a request for a continuance prior to the hearing. (AR 86.) The ALJ granted her request, but advised Plaintiff at length regarding the additional documentary evidence she needed to submit prior to the rescheduled hearing; namely, evidence of her income during the trial work period months, any documentation establishing when she notified SSA of her commencement of substantial gainful activity, and finally, her current financial situation. (AR 360, 365-68.)

### 2) Plaintiff's Second ALJ Hearing

Plaintiff submitted additional documents on November 12, 2010, and on July 14, 2011, Plaintiff had her second hearing. At that hearing, the ALJ asked Plaintiff about her contention that she had a PASS plan.[3] (AR 296-298.) Plaintiff testified that she believed she had a PASS plan, but that she left all the details regarding her participation to her Department of Rehabilitation representative, Sandra Blackburn. (*Id.*) Plaintiff stated that she believed Ms. Blackburn had her on a back to work plan and she did not know that it was not an official PASS plan through SSA. (AR 299.) Plaintiff also testified to her understanding that she remained entitled to benefits as long as she made less than $800 per month. (AR 311-312.)

The ALJ questioned Plaintiff at length about her work with the Marina Chamber of Commerce during 2005 when SSA found that she was within her trial work period because her income exceeded $590 a month. Plaintiff testified that she did not have an employment contract with the Marina Chamber of Commerce for her work as the Executive Director. (AR 302-304.) She was hired as an independent contractor initially to redo the offices and get the Chamber back up and running again. (AR 319.) They told her to buy what she needed and that they would reimburse her if she provided the receipts. (*Id.*) They then provided her salary of $375 every two

---

[3] PASS is a Plan for Achieving Self Support ("PASS") under Title XVI of the Social Security Act. *See* 42 U.S.C. § 1383b(d). To participate in the PASS program, a social security recipient develops and pursues a vocational plan aimed at eliminating or significantly reducing the claimant's reliance on disability benefits. 20 C.F.R. §§ 416.1180–146.1181. The plan must be in writing and approved by the SSA who will conduct an annual review of the plan. 20 C.F.R. §§ 416.1181(a)(2),(d).

4

weeks and reimbursement in one check. (AR 320, 329.)

Plaintiff left the Chamber of Commerce and began working for California State University Monterey Bay in 2006. Although Plaintiff began work in April 2006, she believed her trial work period extended until December 2006 so she continued to spend her social security checks through that date. (AR 342-343.) After December 2006, she left the checks in her account because they were directly deposited, but eventually she spent the money on living expenses. (AR 344.)

At the time of the hearing, Plaintiff was earning $2,400 per month. (AR 337.) However, she was on furlough from the university so she had depleted her savings and did not have any money to afford to repay the overpayment. (AR 345-349.) Her monthly expenses were $2,418.

### C. The ALJ Decision

Three months after the hearing, the ALJ issued her decision denying Plaintiff's request for waiver finding that Plaintiff was not without fault in causing or accepting the overpayment. The ALJ noted that Plaintiff began receiving disability benefits in 1997 and that she returned to work without notifying social security in 2003. (AR 15.) The ALJ found that the first indication SSA had learned of Plaintiff's work activity was a July 3, 2008 notice which advised Plaintiff that beginning April 2006, she was not eligible for disability benefits. (*Id*.) This notice was based on the fact that Plaintiff expended the nine months of her trial work period in June-July 2003, March-September 2005. (*Id*.) Plaintiff's extended period of eligibility thus began in October 2005. (*Id*.) Under the regulations, Plaintiff remained entitled to benefits during the three-month grace period which followed the end of the trial work period, but as of January 2006 she was no longer entitled to disability benefits. (AR 15-16.)

The ALJ noted that much of the testimony during Plaintiff's hearings focused on the amount of money she earned from February 2005 to March 2006 working for the Marina Chamber of Commerce. (AR 17.) Plaintiff offered testimony and documents in support of her theory that she was self-employed under the regulations such that her salary should be offset by normal work related expenses. (*Id*.) Thus, while Plaintiff sometimes received over $800 per month, her salary was only $750 (or $375 every two weeks) and the excess funds represented reimbursement. (*Id*.) Although Plaintiff testified that she never expected to be reimbursed for commuting or other

5

mileage, the ALJ considered and rejected her counsel's argument that Plaintiff should nonetheless be allowed to deduct $20 from her monthly earnings for gas expenses. (AR 17-18.) The ALJ noted that even if she were to deduct this amount from Plaintiff's monthly salary, Plaintiff would still have earned over the amount allowed during the trial work period because Plaintiff was using the wrong earning amount—the higher substantial gainful activity amount rather than the lower trial work period amount. (AR 18.) In doing so, Plaintiff appeared to have relied upon the information provided by Sandra Blackburn from the California Department of Rehabilitation that Plaintiff's disability benefits would continue as long as she did not earn over $800.[4] (*Id.*) The ALJ noted that this was the substantial gainful activity amount (during the relevant time period) and thus a technically correct answer, although it failed to include information regarding the lower threshold income level for the trial work period. (*Id.*) Documentation in the record showed that Plaintiff had been advised of the need to report her earnings and that substantial earnings would affect her benefit payments. Further, the ALJ cited to an email from Plaintiff to Ms. Blackburn in 2008 which stated that "if the SSA is correct I will owe thousands more than I expected for the past two years." (AR 18-19.)

The ALJ concluded that there were "several inconsistencies regarding claimant's alleged 'saving' of the [overpaid] funds." (AR 19.) Plaintiff could not be found without fault in causing the overpayment because even if she notified SSA of the overpayment—although there was no evidence in the record that she did—"there is no credible evidence that the claimant returned, or attempted to return, payments which were incorrect." (*Id.*) Rather, Plaintiff testified that she spent the funds on living expenses when SSA did not respond to her. The ALJ thus found that overpayment may not be waived because "the claimant knew or should have known that her work activity was over the limit allowed, and she accepted payments which she knew to be incorrect." (*Id.*) Because the ALJ concluded that Plaintiff was not without fault, she did not go on to also consider whether recovery of the overpayment would defeat the purposes of Title II or be against equity and good conscience. (*Id.*)

---

[4] The ALJ also noted that there was no support for Plaintiff's statement that she was on a PASS plan because there was no evidence of a written PASS plan in the record. (AR 17.)

**D.     The Appeal's Council Decision**

Plaintiff filed a timely appeal of the ALJ's decision and the Appeal's Council denied her request for review on August 13, 2013. (AR 3.)

**E.     This Action**

Plaintiff filed this action on October 16, 2013 and the case was assigned to Magistrate Judge Lloyd. (Dkt. No. 1.) Nothing happened in the case from December 13, 2013 when the summons was issued until two years later when the court issued an order to show cause as to why the action should not be dismissed for failure to prosecute. (Dkt. No. 7.) Plaintiff appeared for the show cause hearing through counsel and the order to show cause was vacated and Plaintiff was given another 60 days to serve the summons and complaint. (Dkt. No. 21.) Plaintiff did so, but then failed to timely file her motion for summary judgment. (Dkt. No. 28.) Plaintiff was thereafter granted an extension of time to file her motion for summary judgment and did so on December 22, 2016. (Dkt. No. 32.) The case was thereafter reassigned to the undersigned judge. (Dkt. No. 35.) Although Plaintiff was granted an extension of time to file her response to Defendant's cross-motion for summary judgment, Plaintiff failed to submit a response and the time to do so has passed. (Dkt. No. 40.)

## STANDARD OF REVIEW

The Court has authority to review the Commissioner's final decision under the substantial evidence standard. *See* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive ..."); *see also Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996). The Court may overturn the Commissioner's refusal to waive repayment only if that decision is not supported by substantial evidence or is based on legal error. *See Albalos v. Sullivan*, 907 F.2d 871, 873 (9th Cir. 1990). The Ninth Circuit defines substantial evidence as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 2000). The ALJ is responsible for determining credibility and resolving ambiguities. *See id.*; *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). The reviewing court is required to uphold the ALJ's decision "where the evidence is

7

susceptible to more than one rational interpretation." *Andrews*, 53 F.3d at 1039–40. However, the ALJ's findings must be supported by specific, cogent reasons. *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981).

**DISCUSSION**

Plaintiff raises three claims of error: (1) the ALJ's determination of the overpayment amount was in error because she miscalculated when Plaintiff's trial work period ended; (2) the ALJ's determination that she was not without fault is not supported by substantial evidence; and (3) the ALJ should have made findings regarding whether repayment would defeat the purposes of the Act or be against equity and good conscience.

**A. Substantial Evidence Supports the ALJ's Determination of the Overpayment Amount**

**1. Background on Trial Work Period Rules**

A trial work period is a limited period during which a disability recipient may test his or her ability to work without jeopardizing disability status or benefits. 20 C.F.R. § 404.1592(a). A trial work period begins when a claimant becomes entitled to social security disability benefits. 20 C.F.R. § 404.1592(e). As is relevant here, the trial work period ends when the claimant has performed "services" for nine months (which do not have to be consecutive) during a 60-month period. *Id.* § 404.1592(e)(2). "Services" means "any activity (whether legal or illegal), even though it is not substantial gainful activity, which is done in employment or self-employment for pay or profit, or is the kind normally done for pay or profit." 20 C.F.R. § 404.1592(b).

After a recipient completes a trial work period, the recipient may continue to test her ability to work during a 36-month reentitlement period, also known as an Extended Period of Eligibility ("EPE"). 20 C.F.R. § 404.1592a. During this 36-month period, "[t]he first time you work after the end of your trial work period and engage in substantial gainful activity, [SSA] will find that your disability has ceased." *Id.* § 404.1592a(a)(1). "Substantial gainful activity" is defined as "work that (a) [i]nvolves doing significant and productive physical or mental duties; and (b) [i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510. SSA regulations include a table of monthly maximum earnings and if a benefits recipient earns more than the monthly maximum there is a presumption that the recipient engaged in substantial gainful activity for that

8

month. *See* 20 C.F.R. § 404.1574(b); *Keyes v. Sullivan*, 894 F.2d 1053, 1056 (9th Cir. 1990). If the claimant engages in substantial gainful activity during the reentitlement period, the recipient will receive benefits for the first month after the trial work period in which the individual engaged in substantial gainful activity and for the two subsequent months, regardless of whether the individual performed substantial gainful activity during those two months. *Id.* § 404.1592a(a)(2)(i). After this "grace period," however, the Commissioner stops paying benefits "for any month in which you do substantial gainful activity." *Id*.

### 2. The ALJ's Determination is Supported by Substantial Evidence

The Commissioner bears the burden of proving the fact of overpayment by substantial evidence. *McCarthy v. Apfel*, 221 F.3d 1119, 1124–25 (9th Cir. 2000). Thus, "[t]o recover overpayments, the Commissioner must show that the claimant actually received benefits beyond the period of disability or in excess of the correct amount." *Id*. at 1124 (citing 42 U.S.C. § 404(a)). The Commissioner must establish: (1) that [the claimant] received Title II disability benefits [for the designated period]; (2) that these benefits were in excess of the amount to which [the claimant] was entitled; and (3) that the overpayment was in the amount [alleged]." *Id*. at 1124–25. Here, Plaintiff challenges only the second ground, not that she received benefits or that the overpayment was miscalculated based on her monthly disability payments.

The SSA provided, and the ALJ considered, a detailed and comprehensive explanation of the overpayment and how it was calculated, including a clear identification of the months in which Plaintiff worked, whom she worked for, and how the SSA calculated her monthly earnings to arrive at the conclusion that she engaged in substantial work. (AR15-16, 35-44, 72-73.) In particular, the SSA calculated Plaintiff's trial work period as follows:

| **Month and Year** | **TWP Trigger Amount** | **Plaintiff's Monthly Earnings** |
|---|---|---|
| June 2003 | $570 | $1,886.03 |
| July 2003 | $570 | $3,298.57 |
| March 2005 | $590 | $844.30 |
| April 2005 | $590 | $844.30 |

9

| | | |
|---|---|---|
| May 2005 | $590 | $844.30 |
| June 2005 | $590 | $844.30 |
| July 2005 | $590 | $844.30 |
| August 2005 | $590 | $844.30 |
| September 2005 | $590 | $844.30 |

(AR 36-37, 40-44.)

Plaintiff did not dispute her earnings for June or July 2003. Although Plaintiff argued before the ALJ that her earnings were in fact less than $800 for the period of March-September 2005, she conceded that they were at least $750. Substantial evidence thus supports the ALJ's determination that her trial work period ended in September 2005. Plaintiff then had a three-month grace period through December 2005 during which she remained eligible for benefits. Following this, Plaintiff was in her extended period of eligibility and was not entitled to benefits if her earnings exceeded the substantial gainful activity rate of $860 in 2006, $900 in 2007, and $940 in 2008. *See* 20 C.F.R. § 404.1574(b). Plaintiff's earnings from April 2006 through the conclusion of her extended period of eligibility in September 2008 exceeded the substantial gainful activity level. (AR 15; AR 44 (earnings from April 2006 through July 2008 of between $1,440.48 and $3,331.66); AR 231 (2009 tax return showing annual earnings of $35,024); AR 276 (2010 tax return showing annual earnings of $32,979); AR 337 (Plaintiff testified in 2011 that she was earning $2,400 a month).[5]) The ALJ's determination that Plaintiff was overpaid $44,250.80 during this time period is thus supported by substantial evidence.

## B. The ALJ's Waiver Determination

Under Section 404(a) of the Social Security Act, the Commissioner may recover overpaid disability insurance benefits. 42 U.S.C. § 404(a)(1)(A). However, a claimant may obtain a waiver of the overpayment amount if the Commissioner finds: (1) the claimant was without fault, and (2)

---

[5] The Court not find information in the record regarding how much Plaintiff earned in August and September 2008—the final two months of her extended eligibility period. However, Plaintiff has at no point disputed that she continued to earn wages in excess of the substantial gainful activity amount since April 2006 and she continued to work for California State University Monterey Bay through at least the date of her final ALJ hearing in July 2011. (AR 337-339.)

repayment would either defeat the purposes of the Social Security Act or would be against equity and good conscience. *See* 42 U.S.C. § 404(b); 20 C.F.R. § 404.506(a); *Quinlivan v. Sullivan*, 916 F.2d 524, 526 (9th Cir. 1990).

### 1. Substantial Evidence Supports the ALJ's Finding of Fault

Under the applicable regulations, an individual will be found to have been at fault in connection with an overpayment when an incorrect payment resulted from one of the following: "(a) An incorrect statement made by the individual which he knew or should have known to be incorrect; or (b) Failure to furnish information which he knew or should have known to be material; or (c) With respect to the overpaid individual only, acceptance of a payment which he either knew or could have been expected to know was incorrect." 20 C.F.R. § 404.507(a)-(c); *see also McCarthy*, 221 F.3d at 1126. The plaintiff has the burden of proving that she was without fault. *See Anderson v. Sullivan*, 914 F.2d 1121, 1122 (9th Cir. 1990).

The fault inquiry is "highly subjective, highly individualized, and highly dependent on the interaction between the intentions and state of mind of the [plaintiff] and the peculiar circumstances of his situation." *Elliott v. Weinberger*, 564 F.2d 1219, 1233 (9th Cir. 1977) *aff'd in part, rev'd in part on other grounds sub nom. Califano v. Yamasaki*, 442 U.S. 682 (1979). To determine whether a plaintiff is at fault, the SSA must take into account "all the pertinent circumstances surrounding the overpayment" and consider any "physical, mental, educational, or linguistic limitations (including any lack of facility with the English language) the individual may have" in a particular case. 20 C.F.R. § 416.552. In other words, the "fault determination requires a reasonable person to be viewed in the claimant's own circumstances and with whatever mental and physical limitations the claimant might have." *Harrison v. Heckler*, 746 F.2d 480, 482 (9th Cir. 1984).

The ALJ found Plaintiff not without fault both because she knew or should have known that her work activity would affect her benefit payments and because she knew that she was ineligible for benefits, but nonetheless continued to accept them. (AR 18-19.) Plaintiff contends that the ALJ's determination was not supported by substantial evidence because (1) Plaintiff reasonably relied on information she was provided by Ms. Blackburn such that she reasonably

11

believed that her trial work period ended in December 2006 and thus her extended period of eligibility did not begin until April 2007; and (2) Plaintiff notified SSA that she was working prior to this date, but they continued to send her funds and she reasonably spent those funds on living expenses. Plaintiff has not met her burden of showing that the ALJ's denial of her waiver is not supported by substantial evidence.

First, the ALJ considered Plaintiff's argument that she had relied on information provided from Ms. Blackburn regarding income limits. The ALJ noted that Plaintiff had emailed Ms. Blackburn in 2003 to confirm that she could earn up to $740 per month without any effect on her benefits to which Ms. Blackburn had responded that she could earn up to $800 before taxes each month and continue to receive the full SSDI amount. (AR 18.) Ms. Blackburn also noted in that email response that Plaintiff had 9 months total for trial work within any 60 months. (*Id.*) However, the ALJ rejected Plaintiff's reliance on Ms. Blackburn because Plaintiff "knew, or should have known, that her work activity would affect benefit payments." (*Id.*) The ALJ cited to evidence in the record which includes a pamphlet entitled Your Ticket to Work: What You Need to Know to Keep it Working for You," which states:

> If you are working and have substantial earnings, we may stop your case benefits. We can start your benefits again quickly when your income drops or you stop work. For Social Security beneficiaries, this earnings level is called the "substantial gainful activity" level. It increases each year with increases in national wage levels. (For information on the substantial gainful activity level for the current year, call MAXIMUS at the number below.) SSI benefits are reduced as earning increase until your benefits are completely eliminated by your earnings.

(AR 229.) During her personal conference, Plaintiff confirmed that "she had received pamphlets that explained her trial work period and the extended period of disability." (AR 73.)

In determining whether an individual is without fault, "the Social Security Administration considers the individual's understanding of the reporting requirements, the agreement to report events affecting payments, knowledge of the occurrence of events that should have been reported, efforts to comply with the reporting requirements, opportunities to comply with the reporting requirements, understanding of the obligation to return checks which were not due, and ability to comply with the reporting requirements." 20 C.F.R. § 416.552. Here, Plaintiff's only argument is

12

that she was misled by a third-party's representations regarding allowable earning levels, but there is no suggestion that she followed up with someone within the SSA to confirm what the allowable income levels were, nor is there any suggestion that Plaintiff believed that Ms. Blackburn worked for SSA or was authorized to speak on behalf of SSA.[6] But there is evidence that Plaintiff understood the need to report changes in her income to SSA. (AR 227 (8/2/05 letter thanking Plaintiff for reporting her work or changes in her work). Indeed, in December 2006, Plaintiff notified Social Security that as of May 2006 she began to earn over $800 such that she was in her trial work period. (AR 270.) In that letter Plaintiff states that "I expect an adjustment to my current monthly disability benefit and would like information on the continuation of my Medicare health coverage." (*Id*.) This letter suggests a level of knowledge regarding the interplay of work activity and benefits eligibility beyond the limited information Plaintiff received from Ms. Blackburn. (*Compare* AR 270 *with* AR 271-273.) Moreover, the regulations place the onus on the social security recipient to advise the agency of any changes to her income or work activity. *See* 20 C.F.R. § 404.1588(a); s*ee also Anderson*, 914 F.2d at 1124 (upholding the ALJ's finding of fault based on plaintiff's failure to disclose to SSA that he was receiving payments under two different social security numbers when he knew or should have known this information was

---

[6] While not raised by Plaintiff, the Court notes that 20 C.F.R. § 404.510(b) states in relevant part that an individual may not be at fault for an overpayment if she "reli[es] upon erroneous information from an official source within the Social Security Administration (or other governmental agency which the individual had reasonable cause to believe was connect with the administration of benefits under title II of the Act) with respect to the interpretation of a pertinent provision of the Social Security Act or regulations pertaining thereto." Even if Plaintiff cited this section—which she did not either before the ALJ or here—Plaintiff would still not have met her burden because there is no evidence that Plaintiff was under the misimpression that Ms. Blackburn was connected to SSA in any way. To the contrary, the record suggests that while she was working with Ms. Blackburn to return to work, she was separately communicating with SSA regarding her benefits. (AR 227, 270 (2005 and 2006 communications with SSA re: Plaintiff's work activity).) *See Unice v. Berryhill*, No. 3:16-CV-02469, 2017 WL 2972172, at *7 (M.D. Tenn. July 12, 2017) (holding that "waiver avenue is not available, however, because Plaintiff has not identified a Social Security Administration agent's incorrect interpretation of the Social Security Act or its regulations.") Further, Ms. Blackburn's communication cannot be said to "interpret any statute or regulations"; rather, she stated in part "I do not think it will hurt you as long as the payment is not over $740.00 gross per month." (AR 273.) *See Kerr v. Astrue*, No. C10-5824-BHS, 2012 WL 529547, at *3 (W.D. Wash. Feb. 17, 2012) (concluding that Section 404.510(b) did not apply where "the correspondence stated she would continue to receive benefits [ ] did not interpret any statute or regulation or even provide reference to one.").

13

material).  And Plaintiff was advised of this fact when she completed her initial disability application.  (AR 15.)

The ALJ's determination that Plaintiff knew or should have known that her work activity would affect her benefits is thus supported by substantial evidence.  *See* 20 C.F.R. § 404.507(a); *see also* 20 CFR § 404.511(a) (an individual will be at "fault" in accepting overpayment if the Agency "has evidence in its possession which shows either a lack of good faith or failure to exercise a high degree of care in determining whether circumstances which may cause deductions from his benefits should be brought to the attention" of the Agency.").

Second, substantial evidence supports the ALJ's finding that Plaintiff knew that she was not entitled to benefits once she started working at California State University.  Plaintiff testified "I wrote to Social Security after I was hired at CSUMB, and told them that I was on a probationary period, that I figured that my checks should probably come to a halt pretty damn quick."  (AR 341.)  Plaintiff also emailed Ms. Blackburn stating that "[w]hen I became substantially employed (earning over $800 monthly, at CSUMB, I wrote, called, and went to their officer in person to alert them to this fact."  (AR 267.)  While there is nothing in the record to support Plaintiff's efforts to notify SSA of her change in income other than her December 2006 letter to SSA, Plaintiff's statement evidences her knowledge of the fact that her benefits eligibility changed once she started work with California State University.[7]  Plaintiff's argument that she was nonetheless entitled to retain and spend the erroneously supplied benefits because it took SSA so long to recoup them is unpersuasive.  Plaintiff knew that she needed to segregate the funds as confirmed in her July 2008 email to Ms. Blackburn "[i]f they are correct, I will owe thousands more than I expected for the past two years.  I've been saving their payments since become employed full-time."  (AR 267.)  Plaintiff's hearing testimony was more equivocal than her contemporaneous email and she indicated that while she initially retained the funds in her account

---

[7] Even the origin of the December 2006 letter is unclear as it was not part of the record prepared by SSA and instead was submitted by Plaintiff.  (AR 2 (list of exhibits indicating AR 269 was correspondence from Plaintiff), AR 274 (11/12/10 letter from Plaintiff's counsel attaching documents including "her communications with the SSA regarding her income").)  The letter is also unsigned in contrast to the other letters Plaintiff provided.  (*Compare* 269 *with* AR 260, 270.)

14

United States District Court
Northern District of California

she later spent them on living expenses. (AR 344.) In any event, the regulation is clear—a recipient is at fault if she accepts a payment that she knew or could have been expected to know was incorrect. *See* 20 C.F.R. § 404.507(c).

Further, delay on SSA's part does not excuse Plaintiff's actions. *See* 20 C.F.R. § 404.507 ("Although the Administration may have been at fault in making the overpayment, that fact does not relieve the overpaid individual or any other individual from whom the Administration seeks to recover the overpayment from liability for repayment if such individual is not without fault."); *McElvain v. Comm'r of Soc. Sec.*, No. 2:15-CV-0880-KJN PS, 2016 WL 4002018, at *2-3 (E.D. Cal. July 25, 2016) (concluding that although it was undisputed that the Commissioner was at fault in making the overpayment despite plaintiff having notified SSA that he returned to work, Plaintiff was at fault because his "own actions suggested that plaintiff understood the effect of his work activity on his eligibility for DIB"). As the *McElvain* court noted, "the court is not unsympathetic to plaintiff's frustration," but "under applicable law, the inquiry for purposes of whether recovery should be waived is focused not on the Commissioner's fault, but on whether plaintiff [her]self had any fault with respect to the overpayment." *Id.* at *3.

Accordingly, because substantial evidence supports the ALJ's determination that Plaintiff accepted payments that she either knew, or at a minimum, could have been expected to know, were incorrect, the ALJ reasonably found that Plaintiff was not without fault.

### 2. The ALJ Was Not Required to Consider Prong Two of the Waiver Analysis

Finally, Plaintiff argues that that the ALJ erred in failing to consider whether recovery of overpayment would defeat the purpose of Title II or be against equity and good conscience. However, given the ALJ's finding that Plaintiff was not without fault, the ALJ did not need to make a determination regarding the financial requirement for a waiver or to discuss the subject at length. *See Anderson*, 914 F.2d at 1124 ("The ALJ did not address whether appellant meets the financial requirement for waiver...because of the finding that appellant was at fault regarding the overpayment.").

### CONCLUSION

For the reasons stated above, the ALJ's determination that Plaintiff is not entitled to a

waiver of the $44,250.80 overpayment is supported by substantial evidence. Accordingly, Plaintiff's motion for summary judgment is DENIED and Defendant's cross-motion for summary judgment is GRANTED. Judgment will be entered in favor of Defendant and against Plaintiff by separate order.

This Order disposes of Docket Nos. 32 & 38.

**IT IS SO ORDERED.**

Dated: August 4, 2017

JACQUELINE SCOTT CORLEY
United States Magistrate Judge